PAID
FL 000077

ORIGINAL 104

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

U.S. DIST. COURT CLERK
EAST DIST. MICH
FLINT

2008 AUG 26 P 4: 39

FILED

| | |
|---|---|
| **BRADLEY S. AUSTIN** § | |
| **Plaintiff,** § | |
| § | |
| **v.** § | |
| § | |
| **DEANNA LYNN AUSTIN,** § | |
| **SAMUEL D. SWEET, Trustee & PLC,** § | |
| **TRACY M. CLARK & GREGORY M.** § | |
| **SIWAK, STEINBERG, SHAPIRO,** § | |
| **& CLARK, PLC, Attorneys-at-Law,** § | |
| **COUNTRYWIDE HOME LOANS, Inc.,** § | |
| **MORTGAGE ELECTRONIC** § | |
| **REGISTRATIONS SYSTEMS, Inc.,** § | |
| **QUICKEN LOANS, Inc., of Livonia, MI,** § | |
| **TROTT & TROTT, P.C.,** § | |
| **MICHAEL J. BOUCHARD, Sheriff, and** § | |
| **Ruth Johnson, Clerk/Register of Deeds,** § | |
| **OAKLAND COUNTY, Michigan, and** § | |
| **MIKE COX, Michigan Attorney General,** § | |
| **CHRISTOPHER COX, Chairman of the** § | |
| **SEC, KATHLEEN L. CASEY,** § | |
| **ELISSE B. WALTER, LUIS A.** § | |
| **AGUILAR, TROY A. PAREDES,** § | |
| **SEC COMMISSIONERS,** § | |
| **MICHAEL BERNARD MUKASY,** § | |
| **Attorney General of the United States,** § | |
| **Defendants.** § | |

**CIVIL ACTION NUMBER:**

**08 - 13697**

~~**DAVID M. LAWSON**~~

**MONA K. MAJZOUB**

**JURY TRIAL DEMANDED as of**
**RIGHT UNDER THE SEVENTH**
**AMENDMENT, 28 U.S.C. §1861,**
**et seq., and Rule 38 of the Federal**
**Rules of Civil Procedure**

## COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF

1.      The urgent background to and urgent need for this "companion" complaint arises

from the  opinion of this United States District Court in Civil Action **2-07-cv-15127-**

**GCS-PJK,** in an order of which the Honorable George Caram Steeh stated as follows:

> Plaintiff's rights in the Property, whatever they may be, are not the same as
> thing as having a personal stake in the Note.  Therefore, Plaintiff has no
> standing to ask this court to exercise its jurisdiction over the Note to make
> various declaratory judgments relating to the note, or the lending industry
> practice of selling notes similar to the Note signed by Deanna Austin.  There

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*                                    1
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*

is no evidence in the record that would support plaintiff's personal stake in the Note and therefore plaintiff has no standing to bring these claims.

**Case: 2-07-cv-15127-GCS-PJK Document 54 File 08/13/2008 Page 7 of 14.**

2.      In this companion complaint, Plaintiff Bradley S. Austin sues to establish his current property interest real property he has owned since 1974, namely his home and real property at 18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, property which was held titled and deeded in Plaintiff's and Deanna Lynn Austin's name as Joint Tenants With Full Right Of Survivorship.   Plaintiff's primary purpose in this lawsuit is to ask this Court to declare that the June 5th sheriff sale of the property was illegal and that the title was illegally reclaimed by Countrywide. Plaintiff will ask this court, on final trial, to adjudge the foreclosure by advertisement to be null and void and to restore title and deed once again to Plaintiffs name.

3.      Plaintiff further sues to establish that this interest in property also gives him the basis for derivative interest in the note signed and granted by Defendant Deanna Lynn Austin pursuant to a scheme to defraud which was conceived, induced, and implemented by Defendant Quicken Loans, acting by and as a defacto agent for Defendant Countrywide; Plaintiff seeks to establish his standing to demand that the non-judicial foreclosure conducted by Defendants Trott & Trott in June 2007 was and should be declared null and void, transferring no more title than a thief takes by burglary.

4.      Plaintiff has been injured in his property interests by these defendants scheme to defraud him; in fact, Plaintiff is now threatened with eviction proceedings to deprive him of possession of his property based on a foreclosure instituted by parties who (although they fraudulently claim to be holders in due course of a certain note) in fact have no more title to the note signed by Deanna Lynn Austin nor interest in the mortgage contract

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*                              2
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*

signed by Plaintiff as well as his former wife (See Exhibit A: February 28, 2003 Mortgage Contract with Defendant Quicken) than common thieves, no more right to collect a debt from him than mere gangsters in a protection & extortion racket.

5.     This scheme to defraud is actionable under RICO and this court has Federal Jurisdiction pursuant to 18 U.S.C. §1964(c) because Plaintiff alleges and will prove that the scheme to defraud which injured him involves a coordinated conspiracy of Bank fraud in violation of 18 U.S.C. §1344(2) as well as Bankruptcy Fraud aka "fraud connected with a case under title 11", namely the handling of Deanna  Lynn Austin's obligations deriving from this note by Defendants Tracy M. Clark & Gregory M. Siwak of Steinberg, Shapiro, & Clark, P.C., and Trustee Defendant Samuel D. Sweet.

6.     The predicate acts in question took place prior to at the time of the closing (February 28, 2003) of the loan now at issue, when Quicken suggested and then persuaded Deanna Lynn Austin to sign a Loan Application (See Exhibit B: Loan Application and see Exhibit C: Affidavit of True & Correct Copy) in violation of 18 U.S.C. §1344(2) by which Deanna Lynn Austin claimed to have $4,000.00/month in income separate and apart from Plaintiff Bradley S. Austin, when in fact the majority of that amount was from Bradley S. Austin's income; Plaintiff questioned the misstating of the income at the time, but Defendants Deanna Lynn Austin and Quicken prevailed upon him to "look the other way" and to accept and enjoy the benefits of the fraudulent loan application to which he questioned.  Plaintiff trusted his belief that Quickens competent professional judgment of knowing the law in regards what was legal and what was not legal.  All that appears certain now it that defendant Quicken knew how to manipulate or skirt and otherwise take advantage of the lack of governmental (SEC or judicial)

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*                                     3
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced
and "Originated" by Quicken and Signed by Deanna Lynn Austin*

supervision and regulation of the creation, transfer, assignment, sale and purchase of mortgage notes. If SEC Rule 10b-5 applied or applies to mortgage notes, Plaintiff would clearly be able to sue Quicken and all it's co-conspirators for this deceptive and manipulative device of falsely merging identities to achieve a more desirable (i.e. marketable) note.

7.      Defendant Quicken (acting as a classic predatory lender in violation of the Truth-in-Lending Act) agreed and conspired with Deanna Lynn Austin, and in fact actually incited or coercively prevailed upon Deanna Lynn Austin so to misstate her husband's income as her own so that a false identity could be created: namely a false identity based on the merger of Plaintiff Bradley S. Austin's superior income with Defendant Deanna Lynn Austin's superior credit ("FICO") score in order to obtain a lower interest rate.

8.      This false identity (once fixed or "frozen" in the promissory note signed by Deanna Lynn Austin), and unbeknownst to Plaintiff at the time, was then registered, securitized, and bundled with other similar income/FICO score/property combinations to be sold and distributed worldwide, meaning that the identity of the true holder in due course has probably been irreparably lost even though Quicken was almost immediately compensated for originating the note or "issuing" the security based on the fraudulent misrepresentation of the true financial profile of Plaintiff Bradley S. Austin and Defendant Deanna Lynn Austin;

9.      It was SOLELY because of this fraud, initiated at the behest of Defendant Quicken pursuant to a scheme to defraud either conceived by Quicken as agent of Countrywide or conceived of by Countrywide and merely implemented by Quicken,

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*      4
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced
and "Originated" by Quicken and Signed by Deanna Lynn Austin*

using Defendant Deanna Lynn Austin as a "not quite innocent" tool or instrument of the fraud initiated by Defendant Quicken.

**10.**     Defendant Quicken initiated this scheme to defraud, in turn, pursuant to widespread predatory lending custom, practice and policy, fostered by the divorce of a true "lender's" interest from that of his "borrowers", which in turn has been fostered by the SEC and the misguided "judicially crafted list of exceptions" under 15 U.S.C. §78c(a)(10) which has left the vast mortgage backed securities industry virtually unregulated in the United States, with (currently obvious) disastrous consequences to the U.S. and world economies, as well as to private homeowners such as Plaintiff Bradley S. Austin.

**11.**     The aforementioned conspiracy to violate and actual violations of 18 U.S.C. §1344(2) were completed not later than February 28, 2003, when the mortgage closed, rapidly followed by a misleading statement sent through the mail on March 20, 2003, namely the "Notice of Assignment, Sale, or Transfer of Servicing Rights" from Quicken to Countrywide (See Exhibit D: March 20, 2003, Notice of Assignment, etc.).

**12.**     This "Notice", upon review, does not even pretend to state that the NOTE was actually "Assigned, Sold, or Transferred" to Countrywide---Deanna Lynn Austin's note had already been assigned, sold, or transferred in a collateralized bundle, and for all that Plaintiff (or, not so coincidentally, Defendants Quicken, Countrywide, Steinberg, Shapiro, & Clark, PLC or Trott & Trott PC) knows, the note may currently be owned by the Wad of Chewyjaw in Outer Waziristan, or by the Osama bin Laden family trust itself. If these Defendants had attempted a judicial foreclosure, as opposed to a non-judicial foreclosure in April 2007, the Defendants would NOT have been able to prove their

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*                    5
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced
and "Originated" by Quicken and Signed by Deanna Lynn Austin*

standing to sue under or any interest in the note in Court under the rules and standards established by other district courts in the sixth circuit (e.g. *In re Foreclosure cases,* 521 F. Supp. 2d 650; 2007 U.S. Dist. LEXIS 84569, [U.S.D.C.S.D. Ohio, Western Division November 15, 2007]).

13.     Plaintiff Bradley S. Austin contends that he has standing, "a personal stake", in the secured promissory note, because he pledged his real property as the security for the note and because he has an equitable interest in the note; Plaintiff accordingly also files this complaint to assert and establish his standing to sue the entities (Trott & Trott PC and Countrywide Home Loans) who are attempting, but have not yet succeeded to take possession of his property; even though Defendant Quicken had immediately breached the mortgage contract by selling the note, supposedly to Countrywide but in fact to parties not currently known through the improperly and negligently regulated Mortgage Backed Securities or Collateral Backed Obligations securities markets.

14.     After Defendant Quicken's breach, these Defendants then falsely claimed Plaintiff was in default on the mortgage contract when Plaintiff's performance had been excused by Defendant Quicken's initial breach and subsequent fraud;

15.     Plaintiff demanded further assurances of Defendant Countrywide's status as holder in due course in April 2007 and has never since received any indication that Defendant Countrywide even pretends to be the holder in due course.

16.     Accordingly, Plaintiff Bradley S. Austin files this suit to establish his rights and relationships to other parties to protect himself from other entities such as the REAL holder in due course of the promissory note signed by Deanna Lynn Austin (and Plaintiff sues for a declaration of who or which corporation is the holder in due course of the note

secured by Plaintiff with his income (identity, property, and actual post contract payments), or whether the true holder in due course can even be determined.

17.     Plaintiff submits that the holder in due course is the only person (or corporate entity) who or which may actually have a standing to take his property; But above all Plaintiff sues to establish his interest in that certain mortgage note signed by Deanna Lynn Austin as part of their marital estate, related to the refinancing of his home and real property at 18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430.

18.     Plaintiff Bradley S. Austin also sues for declaratory judgment to clarify and define the nature of notes as a class of "money equivalent" (within the meaning of 12 U.S.C. §1813(l)) on the one hand and "security" (within the meaning of 15 U.S.C. §78c(a)(10)) on the other because a certain lack of clarity about such definitions appears to underlie the decision by the Honorable George Caram Steeh, in United States District Court in Civil Action 2-07-cv-15127-GCS-PJK, (see ¶1 of this complaint, above) to evaluate Plaintiff's standing based "entirely" on the absence of his signature on the note without regard to any other legal or equitable aspect of notes or the creation of interest in the same; and accordingly Plaintiff submits that it is now incumbent upon all parties to this case to define the genetic and financial relationship between (1) the mortgage contract (Exhibit A), (2) a note such as that signed by Deanna Lynn Austin which is FUNCTIONALLY a "money equivalent" or "security" (regardless of "any judicially crafted list of exceptions" and U.S. SEC custom, practice, or policy of ignoring the largest engine of securities fraud in the world), (3) the interest which is plainly securitized and marketed as a "Mortgage Backed Security" (MBS) or "Collateral Backed Obligation" (CBO) on the wider securities markets, and (4) money itself (NOT its

equivalent) of which Plaintiff Bradley S. Austin has paid out over $30,000.00 to defend and improve his own interest in the property and which SHOULD establish his interest in the note as a matter of both law and equity.

19.     Plaintiff Bradley S. Austin further asserts his standing as a property owner and as the victim of bank fraud in violation of 18 U.S.C. §1344(2), including the misrepresentation of his income as that of his wife's and the false identity profile thereby created and securitized, and contends that this would be a crime and a theft of his property regardless of whether a note was involved in the case in any way.

20.     In any event, because Defendants have non-judicially foreclosed, in violation of due process of law (which non-judicial foreclosure Plaintiff ask this court to declare null and void on grounds of unconstitutionality of the statute, both on its face and as applied or misapplied in this case to the Plaintiff's property), and then sued Plaintiff for possession of his property on grounds only tangentially related to their claim (or lack of claim) to a note, Plaintiff contends he has standing to defend himself and his legal and equitable interests in his property which long pre-dated February 28, 2003; it is true that the Bankruptcy Trustee and his lawyers Steinberg, Shapiro, & Clark must also bear a share of responsibility for setting MERS and Countrywide up to perform the illegal non-judicial foreclosure after Deanna Lynn Austin's Chapter 7 Bankruptcy was terminated.

21.     The state court judgment for possession (which Judge Steeh called "res judicata" in his August 13, 2008 order) was vacated some time ago and remanded, and accordingly there has been absolutely NO final state court action regarding possession of the property.

22.     In addition, the non-judicial foreclosure (which was NOT in fact reviewed by the eviction/possession court because such a review lies outside the subject-matter

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*

8

jurisdiction of the eviction/possession court) is void because Countrywide and Trott &
Trott did not have standing to foreclose either judicially OR non-judicially because they
were not the holders in due course of ANY note (whether it belonged to or was derived
from Plaintiff's income and property identity or not); in any case, Plaintiff asks this Court
to clarify that any party who could not prove standing to foreclose in a judicial
proceeding likewise has no standing to foreclose in a non-judicial proceeding, and to
finally recognize that eviction/possession proceedings neither constitute nor allow
decision of matters of title or right, including "holder in due course" status to foreclose on
a mortgage contract or promissory note.

**23.**    Furthermore, Defendants MERS, Trott & Trott, and the Oakland County
Defendants also violated statutory foreclosure procedures according to local customs,
practices, and policies unconstitutional, even if the underlying statutes were themselves
constitutional (which Plaintiff also expressly reasserts this complaint to challenge---in
that Judge Steeh's order did not even address this matter in his order of August 13, 2008);
quite simply, the non-judicial foreclosure of June 5, 2007, must be declared null and void
UNLESS Defendants Quicken, Countrywide, or MERS can prove that they would have
standing to foreclose under the holding of *In Re Foreclosure Proceedings*, 521
F.Supp.2d 650 (U.S.D.C. S.D. Ohio, W.Div. 2007).

**24.**    Plaintiff's challenge, herein stated, to the Countrywide/MERS/Trott & TROTT
illegal foreclosure is being presented in state court as a cross-complaint to Countrywide's
complaint for possession and Plaintiff will continue to challenge these matters in both
state and Federal Court, as he is indisputably allowed to do under the holding of *Exxon-*

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*                                    9
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*

*Mobil v. Saudi Basic Industries, 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454, 73 USLW 4266 (2005).*

**25.**     But in that the Court concedes that Plaintiff may have rights "in the Property", without defining them, (even when it is undisputed that the property at 18251 Hickory Ridge Road is in Bradley S. Austin's name, by deed and title) how can the Court allow a fraudulent, predatory "putative lender" such as Countrywide to seize his property interests pursuant to a claimed interest in a note when Countrywide itself cannot establish its own legal standing or equitable interest to sue "under the note?"

**26.**     Which came first the property or the note collateralized by the property?  Bradley S. Austin has owned this property since 1974.

**27.**     Why has the Court turned the Plaintiff's complaint upside down and in effect blamed the Plaintiff for suing to invalidate a note which is being used as an instrument of outright trespass, burglary, and theft of property under fraudulent pretenses?

**28.**     Judge Steeh stated that, within the context of the previously filed case, amendment would be "futile". **August 13, 2008, order at Pages 11 and 14 of 14.**

**29.**     Accordingly, Plaintiff Bradley S. Austin had no choice but to raise these issues by filing this new and separate complaint to address and analyze the issues raised and presented by Judge Steeh's order as a matter of law, while still complaining against Defendant Countrywide & MERS for wrongful foreclosure due to the false claims of Defendants Countrywide and MERS to be the holder in due course or lawfully designated agent for the holder and due course of the note as a matter of fact.  Judge Steeh's August 13, 2008 Order will be analyzed in light of the *MERS v. Azize* case from Florida (see

Exhibit F: Judge Walt Logan's order handed down almost exactly 3 years ago, August 18, 2005, see also Exhibit G).

**30.**     Venue is proper in the Eastern District of Michigan, Southern Division, because a large percentage of the transactions and occurrences giving rise to this lawsuit took place in the Eastern District, and most of the Defendants either have a place of business or do business in the Eastern District of Michigan, as does the Plaintiff Bradley S. Austin.

**31.**     This Court has federal question and civil rights jurisdiction over this complaint under 28 U.S.C. §§1331, 1343, and 1367 as follows:

## FIRST CAUSE OF ACTION: FEDERAL QUESTION TO DECLARE AND REESTABLISH THE ORIGINAL CONGRESSIONALLY INTENDED DEFINITION OF "NOTE" IN THE SECURITIES EXCHANGE ACT OF 1934

**32.**     Plaintiff Bradley S. Austin realleges ¶¶1-31 of this Complaint and incorporates the same by reference as if fully copied and restated herein.

**33.**     Plaintiff seeks a declaratory judgment that the definition of **"security"** in section 3(a)(10) of the **Exchange Act** (which includes a list of financial **instruments** beginning with "any note") includes secured promissory notes (also referred to as mortgage notes).

**34.**     If this court should conclude that the judicially crafted list of exceptions is for any reason mandatory either as a matter of statutory law or judicial precedent, then Plaintiff seeks an alternative declaratory judgment that the definition of **"security"** in section 3(a)(10) of the **Exchange Act** so construed an mandated is unconstitutional and void for vagueness on it's face when so construed and applied as to exclude mortgage notes such as that which gave rise to the present lawsuit.

**35.**     The current codification of this statute at 15 U.S.C. §78c(a)(10) still states:

(10) The term "security" means any note, stock, treasury stock, security future, bond, debenture, certificate of interest or participation in any profit-

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*          11

sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

**36.**   It is a denial of due process and a disingenuous fraud and denial of honest government to exclude the most widely traded collateral backing for securities in the world (mortgage notes) from the definition of securities, and is as irrational as construing a motor vehicle code to regulate all motor cars, trucks, and SUVs except those having two axels and four wheels designed for use by a single driver on the roads and highways for personal transportation or business.

**37.**   Long-standing custom and practice does not alter the fact that this limited interpretation of the definition of securities now codified at 15 U.S.C. §78c(a)(10) means that the modern securities industry is, in effect, beyond regulation, even during the present time of national securities crisis precisely relating to the mortgage industry.

**38.**   Promissory notes are rationally classified as securities whenever and wherever they fulfill the requirements of the Uniform Commercial Code, [compare, e.g., New York's § 8-102(a)(15)(i) (the transferability test), New York's § 8-102(a)(15)(ii) (the divisibility test) and New York's § 8-102(a)(15) (iii) (the functionality test) in order to qualify as a security.   Analysis based on *Highland Capital Management LP v. Schneider,* 2007 NY Slip Op 2791; 8 N.Y.3d 406; 866 N.E.2d 1020; 834 N.Y.S.2d 692;

2007 N.Y. LEXIS 613; 62 U.C.C. Rep. Serv. 2d (Callaghan) 491 (New York Court of Appeals 2007, based on certified question from **_Highland Capital Mgmt., LP v Schneider,_** 460 F3d 308, 2006 US App LEXIS 20993 (2d Cir. N.Y., 2006)).

**39.**     As the New York Court of Appeals has held in relation to New York Securities law, there is quite simply no reason to read the terms in 15 U.S.C. §78c(a)(10) relating to certificated securities and security certificates more narrowly than their plain words suggested (and this argument survives the functional test imposed in **_Highland Capital_** as well as the analysis of the Washington State Supreme Court in **_State v. Pedersen,_** 122 Wn.App. 759; 95 P.3d 385; 2004 Wash.App. LEXIS 1743 (C.A. Wash. Division One)[1].

**40.**     Thus, Plaintiff Bradley S. Austin submits that the promissory note which Deanna Lynn Austin signed, in which he has and herein claims both legal and equitable interest, (whether it should be reformed, rescinded, or nullified as suggested herein below), is papers that definitively embodied and evidenced the underlying intangible obligation to a holder in due course of that note.

**41.**     The note signed by Deanna Lynn's Austin, whether it should ultimately be reformed, rescinded, cancelled, or nullified because of the fraud which Defendant orchestrated with Deanna Lynn Austin in and regarding its creation (issuance), specified one entity as the entity entitled to the security, which satisfies § 8-102(13)(i).

---

[1] **Plaintiff relies heavily on the New York UCC because of the close relationship between U.S. Supreme Court jurisprudence on Securities and the law established in New York State and the Second Circuit Court of Appeals which comprises little else (only Vermont) besides New York State, New York City being, obviously, simultaneously the home plate and pitcher's mound of securities law in the United States of America and, within some limits, the entire world. Moreover, the New York Court of Appeals' decision in _Highland Capital,_ together with the Washington Court of Appeals' decision in _Pedersen_ suggests a return to the "functional" definition of securities implicit both in the statutory language of 15 U.S.C.§78c(a)(10) and the long-time Supreme Court standard functional analysis set forth in _Sec. and Exch. Comm'n v. W.J. Howey Co.,_ 328 U.S. 293, 299, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946) from which laudable and insightful functional standard the Supreme Court's 1990 _Reeves v. Ernst & Young_ decision (with its categorical, artificial and non-functional, "family relationship test") can only be seen as a regrettable and unfortunate retreat.**

_Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:_                                    13
_18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced and "Originated" by Quicken and Signed by Deanna Lynn Austin_

**42.**     Surely the Defendants in this case will agree that Deanna Lynn Austin's note satisfies the transferability test in § 8-102(a)(15)(i) because it is an obligation represented by a security certificate in registered form and because it is all the Defendants contention that mortgage notes are and ought to be freely transferable.

**43.**     Further, her note satisfies the New York divisibility test in § 8-102(a)(15)(ii). Finally, the notes fulfilled the functional test in New York § 8-102(a)(15)(iii)(A) because these obligations were, or were of the type, dealt in or traded on securities exchanges or securities markets---namely the Collateral Backed Obligations Market (CBO) or the Mortgage Backed Securities (MBS) Market, which is collapsing around the world today because of fraudulent transactions induced by predatory lenders such as Quicken, acting on behalf and for the benefit of Countrywide and themselves

**44.**     Finally, it is simply preposterous, in light of two provisions of the SEC Act as amended, namely, **5 (c)(iii)(III):** "a syndicate of banks of which the bank is a member, if the obligations or pool of obligations consists of mortgage obligations or consumer-related receivables" and 15 U.S.C. 78c(a)(41) to allow any interpretation of the term "note" to exclude home mortgage promissory notes (especially given the reference to promissory notes relating even the manufactured homes in (41)(B):

> (41) The term "mortgage related security" means a security that is rated in one of the two highest rating categories by at least one nationally recognized statistical rating organization, and either:
> (A) represents ownership of one or more promissory notes or certificates of interest or participation in such notes (including any rights designed to assure servicing of, or the receipt or timeliness of receipt by the holders of such notes, certificates, or participations of amounts payable under, such notes, certificates, or participations), which notes:
> (i) are directly secured by a first lien on a single parcel of real estate, including stock allocated to a dwelling unit in a residential cooperative housing corporation, upon which is located a dwelling or mixed residential and commercial structure, on a residential manufactured home as defined in

section 603(6) of the National Manufactured Housing Construction and Safety Standards Act of 1974 [42 USCS § 5402(6)], whether such manufactured home is considered real or personal property under the laws of the State in which it is to be located, or on one or more parcels of real estate upon which is located one or more commercial structures; and

(ii) were originated by a savings and loan association, savings bank, commercial bank, credit union, insurance company, or similar institution which is supervised and examined by a Federal or State authority, or by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the National Housing Act [12 USCS §§ 1709, 1715b], or, where such notes involve a lien on the manufactured home, by any such institution or by any financial institution approved for insurance by the Secretary of Housing and Urban Development pursuant to section 2 of the National Housing Act [12 USCS § 1703]; or

(B) is secured by one or more promissory notes or certificates of interest or participations in such notes (with or without recourse to the issuer thereof) and, by its terms, provides for payments of principal in relation to payments, or reasonable projections of payments, on notes meeting the requirements of subparagraphs (A)(i) and (ii) or certificates of interest or participations in promissory notes meeting such requirements.

For the purpose of this paragraph, the term "promissory note", when used in connection with a manufactured home, shall also include a loan, advance, or credit sale as evidence [evidenced] by a retail installment sales contract or other instrument.

## SECOND CAUSE OF ACTION: MICHIGAN'S NON-JUDICIAL MORTGAGE FORECLOSURE STATUTE (CHAPTER 32) IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED IN OAKLAND COUNTY

**45.**    Plaintiff Bradley S. Austin, realleges ¶¶1-44 of this Complaint and incorporates the same by reference as if fully copied and restated herein below.

**46.**    Plaintiff seeks a declaratory judgment, pursuant to 42 U.S.C. §1983, that Chapter 32 of the MCL, in particular 600.3201-600.3212 are unconstitutional as applied in Michigan, as a matter of custom, practice, and policy, because their procedural requirements are not respected as safeguards for private property and contract rights; these same statutes are unconstitutional on their face because they do not provide sufficient "checks and balances" by local authorities such as Oakland County Sheriff

Bouchard and County Clerk Johnson with the knowledge, tools, or information to "audit" demands for foreclosure.

**47.** This court should rule that the Michigan non-judicial foreclosure laws are unconstitutional and as enforced and constituted against the plaintiff constitute a violation of the Fifth and Fourteenth Amendments.

**48.** On or about June 5, 2007, attorneys for Defendant law firm, Trott & Trott, P.C., conducted a foreclosure sale of Plaintiff's home by and through the office of Michael J. Bouchard, Sheriff of Oakland County, in combination and complicity with Ruth Johnson, Oakland County Clerk, Register of Deeds.

**49.** This "non-judicial" foreclosure sale was of a type increasingly common and frequent, but nonetheless fraudulent and therefore illegal, in the United States of America today, whereby a foreclosing party such as Countrywide or MERS, which entities lack actual standing as a bona fide creditors or "holder in due course" to file a foreclosure suit in court pursuant to well-established law as recently explained and articulated *In Re Foreclosure Cases*, 521 F.Supp.2d 650 (2007 U.S. Dist. LEXIS 84569)(S.D. Ohio, Western Div., 2007)(Thomas M. Rose, Judge) merely forecloses by "selling" to itself as a sham transaction to "clear title" to property---which is to say that no economic nor equitable loss is actually recouped, no economic benefit nor equitable gain is actually achieved.

**50.** By this procedure, title is merely divested from the consumer/user by a non-owner, non-agent (in this case, like so many thousands in Ohio one) without standing to sue judicially, who is assisted by the Sheriff and County Clerk under color of law to effect a taking of property for PRIVATE purposes without due process of law.

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*     16
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced
and "Originated" by Quicken and Signed by Deanna Lynn Austin*

**51.**    The format of the foreclosure sale was that Trott & Trott, P.C. foreclosed a note acting as "nominee" for (Defendant Mortgage Electronic Registration Systems, Inc.) (hereinafter "MERS"), acting (ostensibly, but without genuine authority) on behalf of Defendant Countrywide Home Loans, Inc. (hereinafter "Countrywide").

**52.**    Countrywide, in turn, held itself out as the "assignee" of the loan originator (Defendant Quicken), and conducted a sale as part of its role as mortgage "servicer".

**53.**    What rendered this sale simultaneously "typical" of a growing number of mortgage foreclosure proceedings in the United States and yet completely illegal is that neither MERS nor Countrywide own any legal or equitable interest in the note originated by Quicken, for which note Quicken, in fact, was compensated by selling the note.  See Exhibit E: August 18, 2005 Order of Circuit Judge Walt Logan in Pinellas County, Florida, regarding the standing of MERS to foreclose on behalf of others.]

**54.**    Plaintiff herein, Bradley S. Austin, joins a growing number of homeowners and other consumers who are revolting against this epidemic of theft in the United States by refusing to submit to a pattern of doing business which has been challenged and determined by the courts to be illegal in states from Florida to Ohio to Texas.

**55.**    Plaintiff alleges and will show that (1) MERS as the nominee of Countrywide had no standing according to common law principles of contract assignment, in that MERS had neither an equitable nor a legal "stake" in the outcome, (2) Countrywide as assignee of Quicken likewise can prove no ownership interest in Plaintiff's original note, either at the time of sale or at the present time, (3) MERS, acting as "nominee", is engaged in the unauthorized practice of law, (4) the attorneys of Trott & Trott, P.C., are engaged in an "association in fact" racketeer influenced and corrupt organization or enterprise by their

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:* 17
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced
and "Originated" by Quicken and Signed by Deanna Lynn Austin*

knowing, intelligent, and willful collusion and agreement with MERS and Countrywide to collect debts illegally, (5) those Michigan state laws authorizing non-judicial foreclosure, including Oakland County Customs, Practices and policies regarding the enforcement thereof, are unconstitutional on their face and as applied (and for this reason Michigan Attorney General provide the "cover" or "colour of law" for these illegal procedures, also with full knowledge of the lack of Countrywide's and MERS lack of standing to collect any debts whatsoever, regardless of Countrywide's possible former standing as a purchaser or originator of some loans, due to the securitization, sale, and transfer of mortgage notes and agreements into collateralized obligations or securitized mortgage-backed equities, in which nationwide scheme to defraud Countrywide has played a leading role.

56.     This conspiracy to violate Plaintiff's Fifth and Fourteenth Amendment simultaneously injures Plaintiff in his business and property and, by the use of the Power of the State of Michigan to enforce an illegal "taking" of Plaintiff's property without due process of law, also constitutes a violation of Plaintiff's civil rights through the Fifth and Fourteenth Amendments to the Constitution.

57.     this Court declare and adjudge that (1) it infringes on Plaintiff's Fifth and Fourteenth Amendment Rights where state law is construed to authorize a "nominee" masquerading as an agent for an assignee to collect a debt or foreclose on property, (2) that the judicial and legal construction of the 42 U.S.C. §§1981-1982 should be expanded and reframed to include all state laws authorizing "non-judicial foreclosure by theft" without requiring foreclosing parties to prove their legal title and equitable right to foreclose, (3) that the sale of a consumer's signature and credit history as a security is

also a Fifth Amendment Taking as well as a constructive theft by fraud of securities actionable either pursuant to SEC Rule 10b5 or a manipulation of the value of securities actionable under 15 U.S.C. §§78i(a)(1) and (5).

## THIRD CAUSE OF ACTION: REFORMATION OR RESCISSION OF NOTE

**58.**     Plaintiff Bradley S. Austin, realleges ¶¶1-57 of this Complaint and incorporates the same by reference as if fully copied and restated herein below.

**59.**     This Court has jurisdiction over reformation or rescission of the note and mortgage contract for fraud in the inducement because of the specific fraud on the part of the maker at the behest of the originator of this note pursuant to 28 U.S.C. §1367 (Supplemental Jurisdiction over matters inextricably intertwined and arising from the same transaction or occurrence giving rise to the cause of action as a whole).

**60.**     As Plaintiff Bradley S. Austin has specifically alleged in ¶¶3-13 of this Complaint, above, the mortgage contract (Exhibit A), which Plaintiff signed along with his former Wife Deanna Lynn Austin, was induced by fraud, specifically a fraudulent scheme between Deanna Lynn Austin and Quicken that required Deanna Lynn Austin to lie under oath in her financial affidavit.

**61.**     This court can treat this complaint as alleging, through the fraudulent transaction described, whereby Quicken knowingly induced Deanna Lynn Austin to lie under oath about her income so as to obtain a lower interest rate due to her higher FICO score, was a plain manipulation of the value of securities to be issued and sold on the open market, which is actionable under 15 U.S.C. §§78i(a)(1) and (5).

**62.**     15 USC §78i(a)(5) gives express standing to a person "purchasing or offering to purchase the security" and thus complements SEC Rule 10b-5 relating to fraud in the

purchase or sale of securities; Defendant Deanna Lynn Austin was an issuer of a security, her note, "issued" under her signature at the instance "origination" of Defendant Quicken, but Plaintiff Austin in his April 17, 2007, "private settlement" communications with Countrywide and MERS through Trott & Trott was plainly offering to buy the note, for all practical purposes, provided only that Defendants could show that they owned the note and were entitled to payment on it (which of course, they did not provide).

63.    Furthermore, this Court has supplemental jurisdiction (28 U.S.C. §1367) over an important state law question raised by Judge Steeh's order of August 13, 2008: namely, SHOULD THE PROMISSORY NOTE, fraudulently induced to be signed solely and exclusively in the name of Deanna Lynn Austin, be reformed, rescinded, or nullified because of the fraud by Quicken Loans perpetrated on behalf of and in the interest of Countrywide, in that Judge Steeh's key ruling, in effect depends on the erroneous notion that Plaintiff Bradley S. Austin has no interest or "personal stake" in the note signed by his former wife, DESPITE the weight of both Michigan Marital Law and Bankruptcy Law which renders both spouses as "joint debtors?"

64.    These issues are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

65.    While Judge Steeh ruled that it would have been "futile" to amend Bradley S. Austin's Original Complaint filed on or about December 3, 2007, he had not considered the option of reforming or rescinding the note due to the frauds alleged in that complaint, nor those alleged in this present complaint, nor had he considered many issues raised for

the first time in Plaintiff's First Amended Complaint which was never accepted for filing, even though no Plaintiff had really actually filed an answer or "genuine" motion for summary judgment.

66.     WHEREFORE, Plaintiff prays for damages resulting from the Defendant's fraud and violation of 15 U.S.C. §78i(1)-(5), and further prays that the Court will take evidence on this point, submit the same to trial-by-jury of all issues so triable, including mixed questions of fact and law, and that the Court will thereupon render judgment in favor of the Plaintiff for the rescission, reformation, or nullification of the contract and note, as seems most just and right and in the best interests of requiring the parties to conform their conduct to the highest legal and equitable standards; as a further direct result of the nullity of the promissory note and contract, Plaintiff prays that this court will declare NULL AND VOID the non-Judicial foreclosure or his property at 18251 Hickory Ridge Road in Fenton, Michigan, which took place on June 5, 2007.

## FOURTH CAUSE OF ACTION DECLARATORY JUDGMENT TO ESTABLISH PLAINTIFF'S PROPERTY RIGHTS IN NOTE AS "EQUIVALENT OF MONEY" UNDER 12 U.S.C. 1813(l):

67.     Plaintiff Bradley S. Austin, realleges ¶¶1-66 of this Complaint and incorporates the same by reference as if fully copied and restated herein below.

68.     **"Plaintiff's rights in the Property, whatever they may be, are not the same as thing as having a personal stake in the Note."** This first line of the relevant portion of Judge Steeh's opinion raises the question of how rights in property can be used and converted into notes (Deanna Austin's "Note" is consistently capitalized in Judge Steeh's opinion).

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*                                                21

*69.*     Mortgage Promissory Notes are the "equivalent of money" within the meaning of 12 U.S.C. §1813(l), *Federal Deposit Insurance Corporation v. Philadelphia Gear Corp.*, 476 U.S. 426; 106 S. Ct. 193; 90 L. Ed. 2d 428 (1986); and are also "securities" within the meaning of the U.C.C. and general securities law. *Highland Capital Mgt. LP v. Schneider*, 2007 NY Slip Op 2791; 8 N.Y.3d 406; 866 N.E.2d 1020; 834 N.Y.S.2d 692; 2007 N.Y. LEXIS 613; 62 U.C.C. Rep. Serv. 2d (Callaghan) 491 (New York 2007); see also *Highland Capital Mgmt., LP v. Schneider*, 460 F.3d 308, 2006 U.S. App. LEXIS 20993, 60 U.C.C. Rep. Serv. 2d (CBC) 837 (U.S.C.A. 2nd Cir. 2006).

**70.**     Plaintiff Bradley S. Austin asserts that he has both legal and equitable interests in the note, as those terms were used by Judge Walt Logan in the August 18, 2005, MERS memorandum opinion and order, which could be called the "mother of all mortgage note fraud" decisions (Exhibit E).

**71.**     With regard to the first issue Plaintiff asks this Court to clarify its ruling, to declare and adjudge whether a mortgage note is anything more than a bearer note, payable on sight or on demand.

**72.**     Plaintiff asks this court to consider, in deciding this question: If several people offered their property as securities (safety) for a promissory note (via mortgages), wouldn't each and every one of them have an "interest" in the note regardless of whose name(s) is (are) on the note? And, if others offered some other type of security, in addition to the aforementioned mortgages for the same promissory note, wouldn't they also have an "interest" in the note?

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*

22

**73.**    And as a result, Plaintiff asks the Court to conclude: The people who signed the note are obliged to pay it. Individuals in the position of the Plaintiff who didn't sign the note are NOT obliged to pay it but may still have an interest under certain circumstances.

**74.**    For example, others (such as Plaintiff Bradley S. Austin), who have put up their property and income as inducements or securities for the note (even if they have not signed the note and are not obliged to pay the note EXCEPT by contract, such as the mortgage contract which Plaintiff signed, Exhibit A) have an equitable "interest" in the note (within the meaning of Judge Walt Logan's analysis). Plaintiff put up his own property as security for the note, plus pledged his income by signing the mortgage contract so he has a vested interest (stake, financial risk) in the note.

**75.**    Plaintiff asks this court to rule in his favor because, without his income and property pledged in support of the mortgage contract, the note signed by Deanna Lynn Austin would not be the "equivalent of money" within the meaning of 12 U.S.C. §1813(l) and the note could not have been "deposited" into a fund where it was securitized and transferred to other buyers as it was.

**76.**    This Court must recognize that notes are created only after a process of appraisal known as a "loan or credit application" which permits a piece of property to become "security" for a loan; the promise to repay is approved as the "money equivalent" only when the promise to pay and the collateral are approved.

**77.**    The "borrower" in a collateralized mortgage obligation such as the residential refinancing[2] loan which Plaintiff Brad Austin seeks to enforce according to its terms here, and according to law, requires the "borrower" to pledge property plus a personal

---

[2] Although some other credit card debts were paid with the proceeds of the loan originated by Defendant Quicken, subject of this suit, it was primarily a refinancing loan by which a prior mortgage was paid off, and despite the appearance this loan was not characterized as a "home equity loan".

signature-bearing-negotiable instrument (which is the "equivalent of money") for "money" (which, if conceived as stacks of "greenback" Federal Reserve "Notes" is itself an unsecured promissory note from the Federal Reserve Bank to pay the "equivalent of money" and since June 5, 1933 at least, collateralized by..... absolutely nothing).

78.     So, the Court should rule that the signature on the note ALONE does not create the "interest". A promissory note can be collateralized because it is the "promise" to pay that creates the security + collateral. All individuals who expressly pledge security and take associated risk provide the constellation of resources that creates an "interest", so Bradley S. Austin clearly does have a personal stake "interest" in the note.

79.     Plaintiff asks this court to rule and adjudge that Plaintiff pledged much the same, or more interest, than Deanna Lynn Austin did, and accordingly has the same or superior "interest" as she does.

80.     It is simply incorrect, especially in a situation such as that of Plaintiff and Deanna Lynn Austin, to suggest that whoever did not sign the note, is not responsible for the repayment of the note because the responsibility to pay the note is determined by contract (i.e. the mortgage contract).

81.     Furthermore, it is evident that the holder of the is note limited ONLY to foreclosing under the note upon the person who signed the note under current commercial practice---although it could be argued that once Deanna's personal obligation was discharged in Bankruptcy, Countrywide had no continuing right to foreclose "under the note" (which it did not possess) or "under the Mortgage Contract" which Countrywide, Quicken, and MERS had all simultaneously, jointly and severally BREACHED by failing

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*                                      24

to maintain contact with or genuine status as TRUE (de facto AND de jure) agents for the holder in due course of the note (who or which is to this day unknown).

**82.**    Plaintiff would ask this court to declare and adjudge that if a co-guarantor of the note (e.g. Plaintiff) cannot sue to enforce his right under the note, then any other non-party transferee (who cannot show both legal title to a note acquired in a lawful transaction, and equitable interest, i.e. value paid) is also barred (i.e. "foreclosed") from seizing the collateral pledged as security for the note.

**83.**    If Countrywide can destroy plaintiff's rights at a non-judicial foreclosure without the requirement of first proving legal title to and equitable interest in the note, then what must Plaintiff prove in order to have standing to sue them? Plaintiff Bradley S. Austin is suing for declaratory judgment in this and several other counts of this complaint, and Plaintiff specifically requests clarification of the burdens of pleading and proof regarding the establishment, maintenance, and residual ownership of "interests" in a secured promissory note, to which the Court made allusion in its (to this Plaintiff quite unclear and confusing) order of August 13, 2008; relief in terms of clarifying the law as well as the relationships of the parties to this case would seem a very appropriate use of the Declaratory Judgment power of the Court set forth in both 28 U.S.C.§§2201-2202 and 42 U.S.C. §1988(a), to the extent that 5th and 14th Amendment Due Process and takings issues are implicated in this complaint (42 U.S.C. §1988(a) also allows the court great latitude in using the common law and statutes of the United States and Michigan to construct effective remedies).

**84.**    In the sentence from Judge Steeh's opinion quoted as the First issue for declaratory judgment above, the Judge suggested that Plaintiff doesn't have standing to

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*                                      25

sue "under the note". (August 13, 2008 Order at Page 6). But this Court acknowledged that Plaintiff might have some property rights, and these are being extinguished by Countrywide and MERS and Plaintiff must have standing to sue under the security (both collateral and income potential used in approving the credit application) provided for the note which had the effect of making the promissory note "the equivalent of money" within the meaning of Federal Law.

85.     Where the Plaintiff provided the security for the note, the Court should adjudge, declare, find, and rule as matters of fact and law that Plaintiff in fact does have justiciable interests and can accordingly sue "under the note".

## FIFTH CAUSE OF ACTION DECLARATORY JUDGMENT: DEPRIVATION OR LIMITATION ON PLAINTIFF'S INTEREST IN NOTE BY COUNTRYWIDE (WITHOUT PROOF OF HOLDER IN DUE COURSE STATUS) CONSTITUTES A TAKING IN VIOLATION OF THE FIFTH & FOURTEENTH AMENDMENTS

86.     Plaintiff Bradley S. Austin, realleges ¶¶1-85 of this Complaint and incorporates the same by reference as if fully copied and restated herein below.

87.     Judge Steeh further stated in his order of August 13, 2008: "Therefore, Plaintiff has no standing to ask this court to exercise its jurisdiction over the Note to make various declaratory judgments relating to the note, or the lending industry practice of selling notes similar to the Note signed by Deanna Austin."

88.     Plaintiff is uncertain why this sentence follows logically or otherwise from the first. Plaintiff in fact (as the court notes) alleged at least one injury from the lending industry practice of selling notes: he has been foreclosed upon by Countrywide who is the equivalent of an intruder, a burglar, a thief in the night, who has neither right or standing to enter into his property nor claim it as its own; Countrywide came and foreclosed under colour of law without being the holder in due course of the note and did

NOT seek an adjudication of this right before doing so in the Michigan courts, by conducting a non-judicial foreclosure; it is simply preposterous for this Honorable Court to find that a now VACATED judgment of "possession" entered in a court LACKING JURISDICTION TO EVALUATE TITLE could be *"res judicata"* as to a question of ownership, when all the court in question could possibly have decided was right to possession, which is NOT in any event the same thing as a right of ownership.  August 13, 2008, Order at Page 9.

**89.**     Plaintiff alleges that by this Court denying him the right to sue "Under the Note" and saying that he has no interest in the note, this Court is depriving him of his legal and equitable rights, and by having paid thousands of dollars into the mortgage, as well as contributed the underlying security in the house itself, as well as his identity (i.e. FICO score and credit-worthiness profile), this Court is allowing Countrywide, a party without any real standing, to take everything from Plaintiff, and to use the state courts and sheriff as auxiliaries to do so.

**SIXTH CAUSE OF ACTION DECLARATORY JUDGMENT: COUNTRYWIDE AND MERS' SCHEME TO DEFRAUD BY FALSE CLAIMS OF DEBT OWNERSHIP, TO BE NOTE HOLDER IN DUE COURSE OF NOTES**

**90.**     Plaintiff Bradley S. Austin, realleges ¶¶1-89 of this Complaint and incorporates the same by reference as if fully copied and restated herein below.

**91.**     Pursuant to 28 U.S.C. §§2201-2202, Plaintiff alleges that the rights and legal relations between himself, as assignee[3] of all Deanna Lynn Austin's rights, and

---

[3]     **Plaintiff is assignee of all rights in this note, subject of this lawsuit, pursuant both to his divorce and/or separation agreement from Deanna Lynn Austin and several orders entered by the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division, in Cause No. 06-30970, per Judge Opperman "In Re Deanna Lynn Austin" (Chapter 7).  Furthermore, Plaintiff Bradley S. Austin invested a total of over $31,008.07 in payments towards satisfying the requirements** *Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:* *18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently Induced and "Originated" by Quicken and Signed by Deanna Lynn Austin*

Defendant COUNTRYWIDE & MERS, as originator and grantee of Deanna Lynn Austin's note, are unclear for each and every one of the following reasons, that there exists an actual case and controversy within the jurisdiction of this Court, and that Plaintiff is entitled to a declaratory judgment, as well as other and further necessary and proper relief based on this declaratory judgment, against the several commercial defendants, but especially against Countrywide and MERS.

**92.**     Countrywide contends that it was the owner of a valid mortgage note on or about April 18, 2007-June 5, 2007, at which time Countrywide, acting through MERS as its "nominee" or "agent", instituted non-judicial foreclosure proceedings against Deanna L. Austin and Bradley S. Austin based on a mortgage signed on February 28, 2003 with both (then) husband (now Plaintiff) Bradley and wife (Deanna, now discharged in bankruptcy) as signatories.

**93.**     Plaintiff alleges that Countrywide owned no legal or equitable interest in the note during the non-judicial foreclosure, and Plaintiff further alleges that MERS had no lawful status as nominee or agent for Countrywide because MERS gave nothing of value for the note and received nothing of value from Countrywide.

**94.**     Plaintiff alleges, and asks this Court either to take judicial notice, or to allow the parties fully to brief after discovery, and then to declare and adjudge, that Countrywide and MERS in their dealings with Plaintiff and his former wife committed fraud following a common, if not almost a universal, custom, practice, and/or policy in the financial industry (but especially here in Michigan) for a Bank or other lending institution on NEVER to loan its own (bank) funds and ALWAYS to arrange or "originate" transfers of

---

of the note, including $7,842.65 for insurance and taxes, and $23,165.37 paid towards the satisfaction of the note. If such actions do not create "equitable interest" in the note, then what would?
*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently Induced and "Originated" by Quicken and Signed by Deanna Lynn Austin*

funds from other sources pursuant to the Chapter 4A.104 of the Uniform Commercial Code and to misrepresent this transaction as a "loan" for purposes of collection and foreclosure of debts, so that the use of the term "loan" is always knowingly and intentionally misleading in consumer credit transactions.  The fact that a scheme to defraud is common and widespread does not make it any less a fraud.

**95.**    Plaintiff further alleges, and asks this Court to declare and adjudge, that Defendants Quicken, Countrywide & MERS routinely if not always conform to and complies with financial industry standards in this regard, and that Defendant Quicken, (the originator) specifically made no loan, but only originated a funds transfer, in the case of Deanna Lynn Austin's original signed note which Deanna L. Austin was only induced to sign as a result of the approval of the mortgage contract jointly signed by Bradley S. Austin and Deanna L. Austin, which approval resulted from the use of Plaintiff's income as a basis for the issuance of credit, which is to say, for the creation of money issued to cover Deanna L. Austin's note which was immediately "cashed" by Quicken and transferred or assigned to Countrywide without proper formalities of purchase, sale, or exchange of anything of legal or equitable value.

**96.    Times have indeed changed; the reality of the early 21st century mortgage business has now finally been recognized by no less an authority on the subject than the ever eloquent and well-spoken President of the United States, addressing the business, economic, and financial elite of New York City:**

> You know the issue like I do, though. I'm old enough to remember savings and loans, and remember who my savings and loan officer was, who loaned me my first money to buy a house. And had I got in a bind, I could have walked across the street in Midland, Texas, and say, I need a little help; can you help me readjust my note so I can stay in my house? There are no such things as that type of deal anymore. As a matter of fact, the paper -- you

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently Induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*                                    29

know, had this been a modern era, the paper that had -- you know, my paper, my mortgage, could be owned by somebody in a foreign country, which makes it hard to renegotiate the note.

President George W. Bush, March 14, 2008, address to the Economic Club of New York.  http://www.whitehouse.gov/news/releases/2008/03/20080314-5.html.

97.    Two and a half years before the President's comments, (and almost exactly 3

years and 10 days prior to the filing of this Complaint) a Florida Circuit Court judge in

St. Petersburg (the Honorable Walt Logan) had first "pierced the veil" of the false façade

and "standing problem" of the mortgage industry in relation to default and foreclosure:

> The MERS situation seems to have resulted from the establishment of the corporation and agreements with lenders without the participation of the Florida legislature or the Supreme Court in its rule making role. The fact that the market might find it easier to operate with the real party in interest somewhere in the background is not a compelling reason to modify the traditional requirements of a party to establish status to bring litigation. The argument that "...if servicers were not permitted to foreclose in their own name, every multiple investor would have to appear and litigate separately. Practically speaking this is just not possible, and, as a matter of economics it would force consumer credit costs significantly to increase." ….

Page 11 of Judge Logan's Order of August 18, 2005, "MERS v. Azize" (attached as Exhibit E to this Complaint, which is incorporated by reference into this First Amended Complaint as if fully recopied and restated herein)[4].

98.    The standards for debt collection are the same, regardless of the formality of the

debt: only the lender, or a person "in privy" with the lender as transferee of the "asset" of

an account collectible, has the right to collect a debt, and every debtor has the right to

demand (out of court as well as in court) that a person who claims to be the "holder in

---

[4]    Also attached, as Exhibit D, is the order and opinion of the Florida Second District Court of Appeals in *Azize v. MERS*. 965 So.2d 151 (Fla. 2nd DCA 2007), which did not attack or challenge any aspect of Judge Walt Logan's analysis or discussion of the illegality and background of MERS' was of doing business except in the single following regard:

> Specifically, the trial court found that because MERS was not the owner of the beneficial interest in the note, even if the lost note was reestablished and MERS proved that it was the owner and holder of the note, MERS could not properly bring the foreclosure action.

*Azize v. MERS.* 965 So.2d at 153 (Fla. 2nd DCA 2007).

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently Induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*                                          30

due course" of the "Note" in fact acquired the note lawfully, and did not merely steal the note for last week's lunch money based on his status as the class-bully.

**99.**    Plaintiff Bradley S. Austin made a proper demand on the Defendant Countrywide to PROVE its status as the debt-holder.  In fact, there is a separate case number associated with Bradley S. Austin and Countrywide filed with the Clerk of this very U.S. District Court for the Eastern District of Michigan, to wit, Case 2:07-x-50356-GCS-PJK, in which Bradley S. Austin challenged Countrywide's right to proceed against him and demanded proof of Countrywide's lawful authority to do so.

**100.**    As noted in Response to Defendants' Motion to Dismiss, a court should liberally recharacterize a *pro se* litigant's mislabeled works to protect the substantive interests of the party representing himself, especially where, as here, the litigant's intent to object to the validity of the debt and demand proof thereof is too plain to be argued.  Cf., e.g., *Castro v. United States*, 540 U.S. 375, 381, 124 S.Ct. 779, 786, 157 L.Ed.2d 778 (2003).

**101.**    Plaintiff construed Countrywide's failure to respond to his formal notice of refusal to recognize Countrywide's authority as an admission that Countrywide is not the holder in due course of the mortgage note or the right to collect under the mortgage itself, and this Court should rule and adjudge likewise.

**102.**    In regard to any question concerning what he now admits was the  formal irregularity of his "Refusal for Cause" filed April 14, 2007, following his previous demand "Offer" of March 19, 2007, it should simply be remembered that Plaintiff Bradley S. Austin proceeds now, as then, "*in propia persona*" or "*pro se*" only, and that the Court should liberally construe some of his less formally regular filings as the work of a novice only now becoming fully familiar with the Federal Rules of Civil Procedure

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*                                    31
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced
and "Originated" by Quicken and Signed by Deanna Lynn Austin*

and, if Bradley S. Austin's April 14, 2007 filing was admittedly mislabeled and poorly presented, Federal courts are obliged to "look behind the label" of a *pro se* motion to determine if a cognizable remedy is available. *Cf., e.g., Dotson v. Wilkinson*, **300 F.3d 661, 663 (6th Cir. 2002)(citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 384 n.2 (6th Cir. 1999)(en banc), cf. also, *Tannenbaum v. U.S.*, 148 F.3d 1262, 1263 (11th Cir. 1998)**.

103.    Plaintiff disputed Countrywide's right to collect in a series of letters, beginning March 19, 2007, continuing on April 14, 2007, demanding that Defendant Countrywide provide proof of the debt, as Plaintiff is allowed to do under all applicable State and Federal Law.    These letters, regardless of their lack of sophistication, plainly put Countrywide on notice that a dispute existed concerning this loan, and Countrywide failed to provide proof of the debt it was attempting to collect.

104.    Because Countrywide failed or refused to provide any proof of its proper status or standing as a debt collector, Plaintiff Bradley S. Austin had legal justification for his failure and refusal to pay, and this Court should recognize that fact and punish, not the Plaintiff for exercising his right to make a demand, but Countrywide and MERS for proceeding with an illegal and unwarranted non-judicial foreclosure AFTER the filing of Plaintiff's "refusal" (i.e. demand for proof of debt) starting immediately (within four days after) the Plaintiff's April 14, 2007, letter disputing debt (subsequently filed with the U.S. District Court), and proceeded with the non-judicial foreclosure even after the April 24, 2007, recordation IN THIS COURT of Plaintiff's "refusal" (demand for proof of debt), all documents being filed under the Federal Clerk's label: **Case 2:07-x-50356-GCS-PJK.**

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*                                    32

**SEVENTH CAUSE OF ACTION: FDCPA 15 U.S.C. §1692 *et seq.***

**105.**    Plaintiff Bradley S. Austin realleges ¶¶1-104 and incorporates the same by reference as if fully copied and restated herein, noting that the Honorable Judge George Caram Steeh did not even mention the FDCPA allegations of the original complaint in his order of August 13, 2008.

**106.**    **Furthermore,** Plaintiff Bradley S. Austin alleges that Defendants, at best, acting as a collection agency for some unknown "real" holder in interest, violated the **Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*** ("FDCPA") and therefore asks this Court to exercise its supplemental jurisdiction under 28 USC 1367 to enforce and punish Defendants several violations FDCPA as well as parallel but separate violations of the Michigan Collection Practices Act: Mich. Comp. Laws § 445.251 *et seq.* ("MCPA").

**107.**    Plaintiff alleges the following violations of the FDCPA (especially in light of the fact that Plaintiff was the judicial assignee of Deanna Lynn Austin's rights and obligations, assigned with the consent of the Bankruptcy Trustee):

1. § 1692g(b) - **failure** to alert Plaintiff of debt validation notice rights and **failure** to provide **timely** written notice after initial communication,
2. § 1692f - "use [of] unfair or unconscionable means to collect or attempt to collect any **debt**," (including but not limited to the non-judicial foreclosure conducted without standing but with public/county/state assistance including the Oakland County Defendants acting under colour of law).
3. § 1692g(a)(1) - **failure** to send a **timely** written notice of the amount of the **debt,**
4. § 1692g(a)(2) - **failure** to send a **timely** written notice of the name of the creditor to whom the **debt** is owed *(this has been and remains the key offense on the part of Countrywide and MERS, and was the direct and producing cause of the illegal non-judicial foreclosure conducted April 18, 2007-June 5, 2007).*

**108.**    Plaintiff alleges, and asks this Court to declare and adjudge, that COUNTRYWIDE, MERS AND EACH OF THE PRIVATE ATTORNEYS NAMED AS INDIVIDUAL DEFENDANTS hereinabove, acting not as attorneys, but as mere

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*                    33
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced
and "Originated" by Quicken and Signed by Deanna Lynn Austin*

collection agents acting under colour of law, have violated both the FDCPA and the Michigan state statutory and common laws of mortgage lending and foreclosure, in all of the above-described ways.

**109.**   Plaintiff further asks that this Court rule that it is no defense, exactly as Judge Walt Logan described in the passage quoted above and attached as Exhibit E, that the mortgage finance and collection practices have never been reconciled with modern financial industry reality, which was partially (but only partially) authorized and organized under parallel but independent and so unmodified legal schemata or regimes (e.g. the UCC), so that the law and practice of note origination and the law and practice of note collection and foreclosure are out of synch, uncoordinated, and are in fact mutually incompatible with each other, especially (perhaps most obviously but not exclusively) here in the State of Michigan.

**110.**   Plaintiff alleges and asks this Court to declare and adjudge that, in conformity with financial industry custom, practice, and/or policy for Banks or Financial Lending Institutions such as Quicken and Countrywide immediately endorsed and/or sold the note signed by Deanna L. Austin and the Mortgage signed by both Deanna Lynn Austin and her then husband, now the Plaintiff herein Bradley S. Austin.

**111.**   Plaintiff alleges and asks this Court to declare and adjudge that the Defendants sold the mortgage & note created or "issued" by Deanna Lynn Austin and Bradley S. Austin as the lawful and equitable borrowers (or in the very real and meaningful alternative---"beneficiaries" of a constructive trust created by Defendants Quicken and Countrywide who are in the business of the creation of money pursuant to signatures obtained under false pretense of "loan"); and,

**112.**   That the fact it is routine industry-wide practice for "lenders" to fraudulently create money (rather than reaching in their pockets or bank accounts to "lend" money) upon or at the completion of transactions (such as the issuance of mortgage notes) "originated" by "lenders" (such as QUICKEN, COUNTRYWIDE & MERS) is in fact no defense whatsoever to the charges of fraud, creation of constructive trust, conversion, and fraudulent inducement to issues securities which Plaintiff herein states against these Defendants.

## EIGHTH CAUSE OF ACTION (SUPPLEMENTAL JURISDICTION PURSUANT TO 28 U.S.C. §1367): REFORMATION, RESCISSION, OR NULLIFICATION OF CONTRACT AFTER BREACH OF MORTGAGE AGREEMENT BY QUICKEN

**113.**   Plaintiff Bradley S. Austin realleges ¶¶1-112 of this Complaint and incorporates the same by reference as if fully copied and restated herein below.

**114.**   Defendant Quicken, as already alleged, appears to have sold the fraudulently created note signed by Deanna Lynn Austin on the open securities market prior to March 20, 2003, when Quicken announced the "Assignment, Sale, or Transfer" of the "SERVICING" rights (i.e. right to receive payments and to foreclose, with no implication of being owner in due course of the note) to Defendant Countrywide (See Exhibit D).

**115.**   Defendants were, fairly plainly, acting in concert ab initio, and knew exactly what the "name of the game" really was between them.

**116.**   The mortgage contract plainly stated MERS would be the mortgagee or nominee for Lender and its assigns, but also stated that MERS would conform to the law of each jurisdiction in which it operates to establish its rights prior to seeking foreclosure or sale of the mortgage contract, identified within the text of the document as a "security instrument."

**117.**   MERS was obligated to give full credit to all consideration given by the "borrowers", including payments which were the "equivalent of money" as defined by law, such as promissory notes.

**118.**   MERS was also obligated to represent ONLY the true holder in due course (one who, according to the analysis presented in Judge Walt Logan's Pinellas County, Florida, memorandum opinion entered August 18, 2005), but the simple truth is that since not later than March 20, 2003, the trace and track of the true identity of the holder had been lost; even if the true holder in due course should be identified on the day of the filing of this complaint, Plaintiff would be entitled to a full refund of all monies paid to Countrywide (or MERS) between March 20, 2003 and the initiation of non-judicial foreclosure during or about April 2007.

**119.**   By failing to keep track of and maintain a relationship with the true owner and holder in due course of the note, Countrywide and MERS were in breach of the mortgage contract which required them to be the actual "nominee" to act as "mortgagee" for the true holder.

**120.**   It was a serious and material breach of the mortgage contract for Countrywide and MERS to lose track of the true owner of the mortgage/note, especially after securitizing, bundling, and selling the mortgage on the open securities market (by which transaction any and all equity or legal title belonging to Countrywide and/or MERS was immediately extinguished).

**121.**   **WHEREFORE, Plaintiff prays for all his actual, special, and consequential damages for breach of contract and failure to comply with the terms of the mortgage contract signed February 28, 2003 (Exhibit A).**

**122.** The First Element of Plaintiff's actual damage is the amount of $23,165.37 which Plaintiff Bradley S. Austin paid directly towards the satisfaction of the note.

**123.** The Second element of Plaintiff's damages would be the amount of $7,842.65 for insurance and taxes, paid to Countrywide/MERS in the honest and sincere but erroneous belief that these were the holders in due course of the note, subject of this lawsuit.

**124.** Finally, because Defendants breached their implied duties of good faith and fair dealing and operated from a standpoint of unfairly unequal bargaining power, (the inclusion of MERS as nominee, for example, being the type of clause without consideration or benefit to the borrower included only for the "originator's" convenience in an unconscionable contract of adhesion) Plaintiff prays for punitive or exemplary damages in an amount not less than three times his actual damages, to wit, in the minimum amount of $31,008.02 x 3 = $93,024.06.

## NINTH CAUSE OF ACTION, 18 U.S.C. §1962(a) RICO STREAM OF INCOME

**125.** Plaintiff Bradley S. Austin hereby realleges ¶¶1-124 of this complaint and incorporates the same by reference as if fully copied and restated herein below.

**126.** In particular, but without limitation, Plaintiff Bradley S. Austin bases his cause of action for RICO on the allegations of ¶¶2-15 of this complaint.

**127.** Defendants MERS, Countrywide, and Quicken are each enterprises operating and affecting interstate commerce, and each of them has participated as a principal in the ad hoc "association in fact" which Plaintiff will call the "Oakland County Mortgage Mafia" to conduct scheme of racketeering within the meaning of section 2, title 18, United States Code [18 USCS § 2], and each of these Defendants has used or invested, directly or indirectly, all or some part of such income, or the proceeds of such income, in acquisition

of any interest in, or the establishment or operation of, the "Oakland County Mortgage Mafia" an informal association in fact enterprise (centered for purposes of this lawsuit on the firms of Trott & Trott and Steinberg, Shapiro, & Clark, PCs, all of which are engaged in, or the activities of which affect, interstate or foreign commerce.)

**128.    WHEREFORE**, Plaintiff prays for trebled his actual damages in the amount of $93,024.06, plus his costs of suit and litigation.

## TENTH CAUSE OF ACTION: DECLARATORY JUDGMENT RE: SEC & JUDICIAL RESPONSIBILITY FOR CURRENT MORTGAGE CRISIS

**129.**    Plaintiff Bradley S. Austin realleges ¶¶1-128 of this Complaint and incorporates the same by reference as if fully copied and restated herein below.

**130.**    Plaintiff submits that he has been directly injured in his personal financial and property interests by the selling of the note (which he secured with his present income;, previously owned property and actual post contract payments), without receiving from the putative lender any credit or payment to him, especially under the circumstances whereby the note was issued fraudulently pursuant to the inducement by Quicken to Deanna Lynn Austin. This had the unintended collateral effect of depriving Plaintiff of the status of "note signer" which the Court in the original case to which this is companion ruled on August 13, 2008, is the sole source of standing to sue regarding an attempted illegal seizure of property which has been mortgaged (but see Exhibit A: the jointly signed mortgage contract).

**131.**    But the customs, practices, and policies of the unregulated issuance and sales of securitized mortgage notes, unregulated by the SEC and thus unsupervised by the Courts, has also injured the Plaintiff by fostering a disconnected, disjointed financial environment in which "lenders" no longer have any real or genuine "personal financial stake" in the

performance of "their" loans, but instead, have a perverse incentive to maximize foreclosure rates to increase sales far above what they would normally be.

132.    The selling of the note DID cause this Plaintiff harm as alleged above, but it also caused millions of others harm as well.

133.    But the selling of the note DID NOT cause the non-standing of Countrywide to foreclose: what caused the non-standing of Countrywide to foreclose is the fact that they no longer are holders in due course of the note, and what encouraged Quicken, MERS and Countrywide to "lose all track" of the concept of Holder in Due Course was the failed or excessive relaxation of regulation to the point of non-existence on the part of the SEC and the Courts, and THIS court should now so find, declare, and adjudge.

134.    Regardless of whether Quicken/Countrywide/MERS actually sold the note, or if they were forced to give up the note (i.e. in court lawsuit actions or through bankruptcy actions against them), they would not have lost their standing if they had only kept track of the holder in due course upon sale or redemption.

135.    Instead, like so many Mortgagees, Defendants may find it more suitable to their purposes if they fraudulently (misleadingly, with actual knowledge or reckless disregard of the truth) allege and claim that they have "lost the note" (The Ohio Foreclosure cases illustrated the lost note excuse has been quite excessively).

136.    Attorneys such as Trott & Trott and Steinberg, Shapiro, & Clark, as well as County Authorities such as the Oakland County Clerk's office and Sheriff's departments are well aware that the holder in due course is unknown and/or almost impossible to ascertain, yet they participate in foreclosures and are part of the scheme to defraud the people.

**137.** Real holders in due course "care" about the performance of their loans: they are not predatory lenders; they have a REAL "interest" in the note.

**138.** The SEC and Courts have fostered an irresponsible economic culture in America which has become the laughing stock of the post-capitalist world.

**139.** This Court should declare and adjudge that the SEC has breached its public trust and that the Judicially Crafted List of Exceptions to the plain statutory language of 15 U.S.C.§78c(a)(10) is erroneous, injurious, and must be disregarded.

**140.** It is time that the Federal judiciary finally confront the dishonest reality of modern mortgage finance as directly and forthrightly as Florida State (Pinellas County) Judge Walter Logan did in his order of August 18, 2005, three years ago (Exhibit E).

**141.** Only then can the mortgage financial industry in the United States begin to rebuild itself on a sound basis, and this Court should so find, declare, and adjudge.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Bradley S. Austin prays that the Court will find, declare, and adjudge that his legal and equitable contributions of property, income (identity), and payments give him standing to complain about the fraud and mismanagement in connection with the promissory note signed by Deanna Lynn Austin and the mortgage contract ("Security Instrument") which Plaintiff signed jointly with his former wife.

Furthermore, as a result of fraud in the inducement over which Plaintiff had no control and to which Plaintiff objected, Plaintiff asks that the promissory note signed by Deanna Lynn Austin be rescinded, reformed, or nullified, and likewise that the mortgage contract (Exhibit A) be rescinded, reformed, or nullified, and that, as a direct

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently Induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*                    40

consequence, the non-judicial foreclosure conducted on June 5, 2007, be declared null and void as well.

Plaintiff next asks this court to declare and adjudge that mortgage notes MUST be regulated by the SEC pursuant to the plain language definition of notes set forth in 15 U.S.C. 78c(a)(10) must be applied to mortgage notes as a class of widely traded securities, and that the functional "Howey" test should replace the arbitrary and capricious "Family Resemblance" test for the definition of notes.

In addition, Plaintiff asks that this Court declare and adjudge that non-judicial foreclosures are subject to the same standards of standing and proof of right as judicial foreclosures, and that the standards to be applied in Michigan as both those standards of Judge Walt Logan's August 18, 2005 order entered in Pinellas County, Florida, merged together with those announced on November 15, 2007, and afterwards in District Courts throughout Ohio.

Finally, Plaintiff asks for all his direct, consequential, and special damages for breach of contract, fraud, racketeering, and securities fraud in the minimum amount of $93,024.06, plus his costs of suit and litigation.

Respectfully submitted,

August 26, 2008
Monday

Bradley S. Austin, Plaintiff, *pro se*
18251 HICKORY RIDGE ROAD
FENTON, MICHIGAN 48430
Home **Telephone: (810) 629-9923**
**Cellular Telephone: (810) 569-2972**
e-mail:          **brad@healthyhighway.com**

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently Induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*                41

# Exhibit A:
## *February 28, 2003*
## *Mortgage Contract*
## *"Security Instrument"*

*Suit to Establish & Delineate Bradley S. Austin's Interest in Note re:*
*18251 HICKORY RIDGE ROAD in FENTON, MICHIGAN 48430, which was Fraudulently induced*
*and "Originated" by Quicken and Signed by Deanna Lynn Austin*

42

LIBER 29230 PAGE 330

Recordoc Will Pick Up & Forward

250254
LIBER  29230  PAGE  330
$55.00 MORTGAGE
$4.00 REMONUMENTATION
05/19/2003 01:14:52 P.M.  RECEIPT# 41836
PAID    RECORDED - OAKLAND COUNTY
G.WILLIAM CADDELL, CLERK/REGISTER OF DEEDS

CHL

810   023593723   D2   001   001

# MORTGAGE

6071457102

R-1107689

C1092789

Return To:
Kim Majestic
Quicken Loans Inc.
20555 Victor Parkway
Livonia, MI  48152

MIN 100039060714571020

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated      February 28, 2003
together with all Riders to this document.
(B) "Borrower" is Deanna L. Austin, a married woman, and Bradley S. Austin,
her husband



O.K. - AW

Borrower's address is 18251 Hickory ridge , Fenton, MI  48430
. Borrower is the mortgagor under this Security Instrument.

MICHIGAN-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS         Form 3023 1/01

-6A(MI) (0009)
Page 1 of 15          Initials:
VMP MORTGAGE FORMS - (800)521-7291

124662156

6071457102333

CFN # 23593723

## LIBER 29230 PAGE 331

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888)679-MERS.

(D) "Lender" is Quicken Loans Inc.

Lender is a Corporation
organized and existing under the laws of                    the State of Michigan
Lender's address is 20555 Victor Parkway, Livonia, MI  48152

(E) "Note" means the promissory note signed by Borrower and dated        February 28, 2003
The Note states that Borrower owes Lender One Hundred Thirty Two Thousand Three
Hundred and 00/100                                                                      Dollars
(U.S. $ 132,300.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than        March 1, 2033

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider          ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider  ☐ 1-4 Family Rider
☐ VA Rider                   ☐ Biweekly Payment Rider     ☒ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6A(MI) (0005)                        Page 2 of 15            Initials:            Form 3023 1/01

# LIBER29230PAGE332

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the
County            of            Oakland
[Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.

Parcel ID Number:   06-08-100-009            which currently has the address of
18251 Hickory Ridge                              [Street]
            Fenton
("Property Address"):              [City], Michigan 48430   [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

-6A(MI)          Page 3 of 15          Form 3023 1/01

## LIBER 29230 PAGE 333

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any;

## LIBER 29230 PAGE 334

(c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials: JM BSH

# LIBER 29230 PAGE 335

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the

# LIBER29230PAGE336

work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

-6A(MI) (0006)                              Page 7 of 15                              Form 3023 1/01

# LIBER 29230 PAGE 337

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

Initials: [signature]